# Court of Appeals.

June 27, 1893.

## PEOPLE v. MARTIN FOY.

(53 St. Rep. 265; 138 N. Y. 664.)

1. Homicide—Proof.

The act, in this case, was held to have been too deliberate to bring the case down to murder in the second degree, or to any of the degrees of manslaughter, and the plea of insanity to have been without evidence to support it.

2. Same—Charge—Insanity.

Where the whole case is barren of evidence upon which to base a claim that the defendant was insane when the act was committed, no harm is suffered by defendant from a charge that "the insanity the law speaks of is that which comes by physical visitation of God, it is something that makes the man helpless, so that in killing a person he acts as though unconscious, with inability to control himself, as though the subject were struck by lightning."

3. Same.

A charge that, "if there is any such thing as insanity produced by jealousy or revenge, or wrath, then, so far as affecting the prisoner, it is the same as any other insanity," is proper.

4. Same.

The heat of passion and feeling, produced by motives of anger, hatred or revenge, is not insanity.

Appeal from judgment of the Saratoga oyer and terminer, convicting defendant of murder in the first degree.

Willard J. Miner, for appellant.

J. S. L'Amoreaux and John Person, dist. atty., for respondents.

PECKHAM, J.—The defendant was indicted for the murder of one Henrietta Wilson, in the village of Saratoga, on the 13th of May, 1892, and upon the trial of the indictment at the Saratoga oyer and terminer, held in January, 1893, he was convicted of the crime and sentenced to death. From the judgment of conviction he has appealed to this court. In examining the record for the purpose of seeing whether justice requires a new trial, which in such case we have authority to grant, we entertain no doubt whatever of the propriety of the verdict. The evidence, in our judgment, shows most conclusively that the defendant has committed a deliberate and cruel murder. That he was laboring under the passion of jealousy and was very angry with his victim, the evidence shows quite conclusively. It appears that he had known the woman for some time, and that a short period before the murder he had said to her in a conversation in Saratoga, which was overheard, that he intended to go away, and she remonstrated and said as long as she had

a dollar he could have it, and he replied that she had ruined him; that he was broke, and she was throwing him out; that she had another mash, and that he was going away.    He did go away and was gone a short time, and then came back to Saratoga, and said he had come to kill her and Dick Shay.  This was said on the morning of the 13th of May, 1892, as he got off the cars, and at about 6:15 or 6:30 in the afternoon he shot the woman.

The murder was committed in one of the public streets of the village, and while several people were on the street and in the immediate neighborhood.  The defendant was evidently waiting for the woman, and when he saw her coming along the street he walked toward her at a quiet pace, and upon coming up with her pointed his pistol at her head and deliberately shot her.  She fell, and he then shot her again while she was lying on the sidewalk.  He then pointed the pistol at himself, and fired two shots, inflicting slight wounds upon his scalp, and falling down near his victim he heard her moan, when he forthwith emptied another barrel of his pistol at the dying woman and accompanied the shot with an oath, saying he knew she was dying, and he was glad of it, and that it was all for love; that Dick Shay had done it.

The woman lived about a day.  The defendant was taken to the lockup the evening of the shooting, and inquired the next day how the woman was, and when told she was still alive, said with an oath that he was sorry for it, that he had tried hard enough to kill her and himself, and was sorry he had not killed both.  He said he had pawned his overcoat in New York to get the pistol and a ticket to come to Saratoga to kill the girl.  He was taken into the presence of the woman soon after the killing, and when identified by her, he said, "Yes, I shot you and I hope you will die, and I am willing to suffer for it."  He said Shay was the cause of all of it, Shay and Martin, and that he had intended to kill them also.

The case thus made against the defendant was met by him with an effort to prove a kind of temporary insanity.  The effort completely failed.  The evidence in regard to his insanity is hardly sufficient to even give color to the defense, and the whole record leaves no doubt upon our minds that any verdict other

than one for murder in the first degree would have been a sad miscarriage of justice. The defendant was seemingly carried away by his brutal passion of rage, intermingled with jealousy, and he indulged such passion to the extent of murdering the woman who was the cause of his jealousy. There was nothing to bring the case down to murder in the second degree, or to any of the degrees of manslaughter. The deed was too deliberate for anything of the kind, and the plea of insanity was wholly without evidence to support it.

There were some exceptions taken during the course of the trial, but we think there is not merit enough in them to call for their discussion.

The counsel for the defendant criticises to some extent the charge of the learned judge upon the subject of what constitutes insanity, although the point to which he has directed our particular attention he did not except to. In that portion of the charge given upon the return of the jury without having as yet agreed upon a verdict, where the court stated that the insanity the law speaks of is that which comes by physical visitation of God; it is something that makes a man helpless, so that in killing a person he acts as though unconscious, with inability to control himself, as though the subject were struck by lightning.

The court had prior to that time given correct instructions as to insanity, and subsequent to that time it explained to the jury the law upon the subject. Upon the merits it is apparent that no harm was suffered by the defendant from this charge, for the whole case is barren of evidence upon which to base a claim that the defendant was insane when the act was committed, or at any other time.

The court in fact did, both before and after this expression, explain fully to the jury the law upon the question of insanity, and it is too clear for discussion that the defendant has suffered nothing at the hands of the court upon this branch of the case.

The defendant also complains of the charge made in reference to his request that insanity produced by jealousy or anger, if it incapacitates the subject from knowing right from wrong, would be a defense. To which the court assented, by saying,

"if there is any such thing as insanity produced by jealousy, or revenge, or wrath, genuine insanity; I do not mean turbulence of passion produced by desire for revenge, but if there is any genuine insanity produced by any cause, then, so far as affecting the prisoner, it is the same as any other kind of insanity." The defendant can find no fault with that definition. The court very properly continued with an explanation to the jury that "the heat of passion and feeling produced by motives of anger, hatred or revenge, is not insanity. The law holds the doer of the act under such conditions, responsible for the crime; because a large share of homicides committed are occasioned by just such motives as these."

The remarks of the court to the jury upon the occasion of the reading to them the evidence of the witness, Carswell, were entirely proper.

The record shows that the court had no thought of asking the jury to decide the case upon the testimony of any one witness to the exclusion of any testimony that was before them. It is apparent from the questions put by the jury that some one or more of the members thereof had conceived the idea that the fatal shot possibly was not fired by the defendant until he had shot himself twice, and that he might, after he was himself thus injured, have fired the last shot at the deceased, which possibly, was the fatal one, and that when he did so he might have been temporarily insane, and not, therefore, responsible for his act. However extraordinary this theory might in any event be, it is clear the court had the evidence read for the purpose of showing that the facts left no foundation upon which to base it. The evidence of the witness who saw the shooting is to the effect that the defendant shot the deceased first in the head and that she then fell, and that the second shot was pointed at her back, as she was lying on the sidewalk. And after the second shot he fired twice at himself and then a final one at the deceased. The wound in the back was the fatal one, and was fired before he shot himself. The evidence of the witness Smith is not in the slightest degree contradictory of this testimony. He first heard a shot and scream, and then he looked out of the window of the house where he was and saw defendant shoot; the defendant stood over the deceased and held the revolver down like that

(illustrating), and the witness saw the smoke and heard the report. The witness does not pretend the second shot that was fired was not in the back of the deceased. There is no merit in the point here urged.

We have carefuly read and considered all the other points made by the learned counsel for the defendant in his exhaustive brief on the subject, but fail to find any ground for disturbing the verdict. It would have been most unfortunate for the administration of justice, as we think, if upon the whole evidence in this case any other verdict had been rendered.

The judgment must be affirmed.

All concur.